**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALHOUN E. CHARLES, ) | Civil No. 07cv397 LAB (NLS) |
| ) | |
| Plaintiff, ) | **REPORT AND RECOMMENDATION** |
| v. ) | **FOR ORDER DENYING PETITION** |
| ) | **FOR WRIT OF HABEAS CORPUS** |
| ROY A. CASTRO, Warden; and GARRETT ) | |
| BEAUMONT, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Calhoun E. Charles (Calhoun or Petitioner),[1] a California prisoner proceeding *pro se*, filed a

Petition for Writ of Habeas Corpus (Petition) under 28 U.S.C. § 2254. Petitioner contests his

confinement on the bases that the trial court (1) violated his due process rights by convicting him based

on insufficient evidence; (2) improperly admitted evidence of prior crimes in violation of his due

process rights; and (3) violated his rights to due process and a fair trial by sentencing him to consecutive

terms using an improper standard of proof. [Doc. No. 1.] Petitioner also attempts to join his co-

defendant, Maurice Hillard (Hillard), to his habeas claims.

Respondent timely filed an Answer, arguing that the Court should deny the Petition because the

state court's determinations do not contradict clearly established federal law nor unreasonably apply the

facts to the governing federal laws. [Doc. No. 8.] Despite this Court having given Petitioner a second

opportunity to file a traverse, Petitioner still never filed one.

---

[1] The state record refers to Petitioner as "Charles Calhoun" or "Calhoun," contrary to Petitioner's name in the caption here. To avoid confusion with excerpts from the state court record, this Court will refer to Petitioner as "Calhoun" rather than as "Charles."

This Court has reviewed the Petition, Answer, lodgment and the complete record in this case. After a thorough review, the Court **RECOMMENDS** that the Petition be **DENIED** in its entirety.

### STATE COURT PROCEDURAL HISTORY

Calhoun and co-defendant Hillard (collectively, Defendants) were charged with conspiracy to commit grand theft (count 1), unlawful taking or driving a vehicle (counts 2, 3, 9, 10, 14, 17), attempted burglary (count 4), evading an officer with reckless driving (count 5), receipt of stolen property (count 6), harming or interfering with a police animal (count 7, Calhoun only), resisting an officer (count 8), burglary (counts 11 13, 15, 18), grand theft (counts 12, 16) and attempted grand theft (count 19).[2] The information also alleged against Calhoun three prior prison terms and one prior strike.[3]

A jury acquitted Calhoun of count 4[4] but convicted him on the remaining counts[5]. The trial court sentenced Calhoun to state prison for 28 years and 4 months.[6] The sentence included six years under count 1; consecutive terms of one year and four months for each of counts 1, 5, 6, 11, 13, 15 and 18; consecutive terms of two years for each of counts 3, 9, 10, 14 and 17, and three one year terms for each of the prior prison enhancements.[7] The trial court ordered concurrent terms for counts 7, 8 and 19 and stayed the sentence under counts 12 and 16.[8]

The California Court of Appeal, Fourth District, Division One affirmed the judgment on April 19, 2006.[9] Calhoun petitioned to the California Supreme Court for review.[10] On August 18, 2006 that court denied the petition, but stated the denial was "without prejudice to any relief to which defendant might be entitled after the United States Supreme Court determines in *Cunningham v. California*, No. 05-6551, the effect of *Blakely v. Washington* (2004) 542 U.S. 296 and *United States v. Booker* (2005) 543 U.S. 220, on California law."[11]

///

---

[2] Lodgment 1, Clerk's Transcript, Vols. 1-2 (CT), pp.18-25.
[3] Lodgment 1, CT pp.25-26.
[4] Lodgment 1, CT p.380.
[5] Lodgment 1, CT pp.370-410.
[6] Lodgment 1, CT pp.437-439, 455-456.
[7] Lodgment 1, CT pp.437-439, 455-456.
[8] Lodgment 1, CT pp.437-439, 455-456.
[9] Lodgment 6.
[10] Lodgment 7.
[11] Lodgment 8.

1

## FACTUAL BACKGROUND

2    Defendants conspired to take and unlawfully drive stake bed trucks installed with hydraulic

3  Tommy lifts and to use those trucks and other equipment to steal automated teller machines (ATMs)

4  (count 1).[12] Defendants' modus operandi involved stealing a large stake bed truck with a lift gate,

5  wrapping an ATM machine with heavy chains and pulling it from its location with the truck, and then

6  using drilling devices to open the ATM and steal the cash.[13] Defendants would eventually abandon the

7  truck and ATM machine, and steal a different truck to commit another ATM theft. Police detectives

8  observed that Defendants' method of operation revealed a methodical, professional approach to the

9  crimes.

10    Evidence tied Defendants to the unlawful taking or driving of these vehicles: a blue Nissan

11  Frontier truck stolen from a strip mall parking lot in Torrance, California on October 25, 2001 (count

12  3);[14] a 2003 Ford F-550 truck with a Tommy lift stolen from ICI Paints between July 18-21, 2003 (count

13  10);[15] and a Ford F-350 United Rentals stake bed truck stolen on October 6, 2003 (count 2).[16]

14    The evidence demonstrated that Defendants also engaged in this series of crimes. Between June

15  7 and June 10, 2003, Defendants stole a ThyssenKrupp Elevators (ThyssenKrupp) 2000 Ford F-350

16  truck outfitted with a Tommy lift and black pipe rack (count 9).[17] They used that truck on August 5,

17  2003 to burglarize the San Diego Hall of Champions Sports Museum (counts 11, 12).[18] A Union Bank

18  ATM had been taken from the museum. When police found the stolen ATM, it had two two-inch holes

19  drilled into the ATM safe door.[19] The ATM was surrounded by little metal shavings and glass

20  particles.[20] When it was stolen, the ATM contained $19,500 in cash.[21]

21  _____

22    [12] Lodgment 2, Reporter's Appeal Transcript, Trial Proceedings Vols. 1-9 (RAT), pp.20-21.
    [13] All facts not followed by a direct citation to the lodgment come from the appellate court opinion denying Petitioner's
23  direct appeal. *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual findings of both state
    trial and appellate courts); *Garvin v. Farmon*, 258 F.3d 951, 952 (9th Cir 2001) (paraphrasing facts from the state court opinion).
24    [14] Lodgment 2, RAT p.715:19-27.
    [15] Lodgment 2, RAT pp.268:18-269:4, p.270:2-10, p.717:1-14.
25    [16] Lodgment 2, RAT p.92:16-18, p.714:26-16.
    [17] Lodgment 2, RAT p.331:11-14, pp.333:10-336:2.
26    [18] Lodgment 2, RAT p.971:1-9. The thieves had left a rack from a truck's tailgate at the crime scene. ThyssenKrupp's
    parts manager, who had built the pipe rack for his company's truck, identified the rack recovered from the Hall of Champions
27  as the one that belonged to the stolen ThyssenKrupp truck. Lodgment 2, RAT p.337:9-25; pp.560:3-562:16.
    [19] Lodgment 2, RAT pp.508:17-509:11; p.724:4-14.
28    [20] Lodgment 2, RAT p.510:8-27, p.725:13-28.
    [21] Lodgment 2, RAT p.567:8-17.

On September 20, 2003, Defendants used the same stolen ThyssenKrupp truck to break into Dominic's Deli (count 13).[22] Defendants broke the Deli's front glass doors and two windows.[23] They wrapped a rope and chain around the ATM inside the deli and tried to pull it out of the building.[24] They did not succeed, however, and no ATM was stolen.[25]

Also on September 20, 2003, Defendants stole a Sherwin Williams Ford F-450 stake bed truck from the Sherwin Williams on Miramar Road (count 14).[26] Defendants used that truck to burglarize a Chevron gas station on Torrey del Mar Road on September 22, 2003 (counts 15, 26).[27] The burglars smashed a window and removed an ATM that had been bolted to the floor.[28] The store's security video camera captured the image of two burglars using a truck with the Sherwin Williams logo on it.[29] When police recovered the stolen ATM, they saw that it had a two-inch hole drilled through the lock.[30]

In September 2003, Robert Davies, owner of Davies Electric in Miramar, brought one of his work trucks–a Ford F-450 stake bed truck with a lift gate–to a Firestone repair shop on Miramar Road.[31] Defendants stole Davies' truck from the Firestone shop (count 17).[32] On October 1, 2003, Defendants used the Davies Electric truck to commit burglary and grand theft of the Beacon gas station on Santo Road (counts 18, 19).[33] One witness saw a white truck in front of the station, then saw two men run in and out of the store, get in the truck and try to pull something out of the store with a chain.[34] A second witness saw two men in dark clothing, probably both bigger than 6 feet and 200 hundred pounds, trying to hook a cable running from the truck to something inside the store.[35]

Meanwhile, also on October 1, 2003 Davies–whose truck was stolen from the Firestone repair

---

[22] Lodgment 2, RAT pp.462:5-464:21; pp.481:15-482:10.
[23] Lodgment 2, RAT p.475:8-15.
[24] Lodgment 2, RAT pp.358: 3-360:10; p.475:16-20; p.477:7-27.
[25] Lodgment 2, RAT pp.474:15-475:7.
[26] Lodgment 2, RAT pp.485:15-486:7; pp.488:14-489:7.
[27] Lodgment 2, RAT p.568:3-26; p.570:8-24.
[28] Lodgment 2, RAT pp.571:6-572:12.
[29] Lodgment 2, RAT pp.572:28-574:16; p.972:6-24.
[30] Lodgment 2, RAT pp.507:13-508:16; pp.664:21-665:17; p.675:1-8.
[31] Lodgment 2, RAT pp.84:10-85:17, p.87:2-11, p.88:17-27.
[32] Lodgment 2, RAT pp.87:22-:88:6.
[33] Lodgment 2, RAT pp.676:9-679:3.
[34] Lodgment 2, RAT pp.690:18-696:6.
[35] Lodgment 2, RAT pp.702:1-704:18.

4

shop–rented a Ford F-350 truck from United Rentals to replace his Ford F-450 for work.[36] On October 6, 2003, Defendants stole the United Rentals truck from the Davies' Electric property (count 2).[37] They also stole the padlock that locked the gate at Davies Electric.[38]

The United Rentals truck was equipped with a LoJack.[39] The night of October 9, 2003, a detective conducted surveillance of the United Rentals truck in a business park in Sorrento Valley.[40] While surveilling that truck, he saw the blue Nissan Frontier truck approach it.[41] The detective watched the passenger get out of the Nissan and go to the passenger side of the United Rentals truck.[42] He observed two men make several trips between the trucks as they transferred equipment from the Nissan to the United Rentals truck.[43] The driver and passenger (the detective identified Hillard as the passenger in both trucks)[44] left the Nissan and drove away at about 12:29 a.m. in the United Rentals truck.[45]

Around 1:25 a.m., thanks to the LoJack, the police located the United Rentals truck in the parking lot of a 7-11 convenience store near Escondido.[46] They then engaged in a high-speed chase of the United Rentals truck (counts 4, 5).[47] The truck's driver drove erratically, by, for example, using all lanes of travel to overtake other vehicles, running red lights and speeding.[48] The chase continued onto State Route 78 and continued through the streets of Escondido. The pursued United Rentals truck finally crashed into a parked car and the driver and passenger fled on foot.[49]

The first deputy on the scene pursued the driver–Calhoun–by foot with his police dog.[50] In his attempt to flee, Calhoun picked up a wooden slat from a fence and started to beat the dog over the head

---

[36] Lodgment 2, RAT p.88:7-16, p.715:2.
[37] Lodgment 2, RAT p.92:16-18, p.714:26-16.
[38] Lodgment 2, RAT pp.287:22-288:15, pp.293:27-294:9.
[39] Lodgment 2, RAT p.93:2-13. The Court uses the term "LoJack" to refer to the LoJack Stolen Vehicle Recovery System, which "is an aftermarket vehicle tracking system that allows vehicles to be tracked by police after being stolen." *See* Definition of LoJack, *available at* http://en.wikipedia.org/wiki/LoJack.
[40] Lodgment 2, RAT pp.108:23-109:10.
[41] Lodgment 2, RAT p.112:8-11, pp.114:27-115:4.
[42] Lodgment 2, RAT pp.115:28-116:7.
[43] Lodgment 2, RAT pp.119:16-120:1.
[44] Lodgment 2, RAT pp.119:16-121:17.
[45] Lodgment 2, RAT p.123:12-22.
[46] Lodgment 2, RAT p.196:1-24, p.198:16-28.
[47] Lodgment 2, RAT pp.199:3-200:10.
[48] Lodgment 2, RAT p.203:18-27.
[49] Lodgment 2, RAT pp.206:26-207:20.
[50] Lodgment 2, RAT pp.208:8-209:9.

with it (counts 7, 8).[51]  The dog then started biting Calhoun.[52]  Shortly after the police dog got to Calhoun,

the first deputy arrested him.[53]  At the time of his arrest Calhoun was wearing maroon tennis shoes,

gloves, a blue sweatshirt, black jeans and a green ski mask with the holes cut out for eyes.[54]  Calhoun

falsely identified himself as "Jonathon Calhoun."[55]

Other deputies chased the passenger–Hillard–for about 10 to15 minutes on foot over fences and

through people's yards.[56]  At the time of his arrest Hillard was wearing gray sneakers, blue jeans and a

dark blue sweatshirt.[57]  Hillard also falsely identified himself when he was arrested.[58]

The detective on the Sorrento Valley stakeout identified the United Rentals truck he surveilled in

the Sorrento Valley parking lot as the same one that crashed into the parked car in Escondido.[59]  He also

identified Hillard as one of the men who was moving equipment from truck to truck.[60]

**Police Searches of the Recovered Trucks.**

Police impounded and searched the Nissan Frontier left in Sorrento Valley.[61]  The license plates

on the Nissan were not registered to it, but the correct plates were found inside it.[62]  Police found several

other stolen items in the Nissan (count 6), including two license plates from an ICI Paints vehicle that

were stolen at the same time as the ICI Paints truck,[63] other license plates,[64] ThyssenKrupp hard hats and

a generator kept in the stolen ThyssenKrupp truck,[65] and the padlocked chain stolen from the Davies'

Electric yard at the same time the United Rentals truck was stolen.[66]  Police found several tools in the

---

[51] Lodgment 2, RAT pp.209:11-211:20.
[52] Lodgment 2, RAT p.210:1-20.
[53] Lodgment 2, RAT p.212:5-24.
[54] Lodgment 2, RAT pp.540:22-541:10; pp.981:10-982:6.
[55] Lodgment 2, RAT p.1039:5-9.
[56] Lodgment 2, RAT pp.184:12-185:10.
[57] Lodgment 2, RAT p.540:12-16; p.542:5-22.
[58] Lodgment 2, RAT p.174:1-23.
[59] Lodgment 2, RAT p.125:10-21.
[60] Lodgment 2, RAT pp.125:22-127:10.
[61] Lodgment 2, RAT pp.280:21-281:18.
[62] Lodgment 2, RAT p.283:7-21; p.295:19-26.
[63] Lodgment 2, RAT pp.268:18-269:4; pp.297:23-298:1
[64] Specifically, police found one plate stolen from Kyle Knaphus's Toyota around October 2002 and two plates stolen from Daniel Hrigora's Jeep around October 2002.  Lodgment 2, RAT pp.260:5-261:2; p.296:7-18; pp.715:28-716:13.
[65] Lodgment 2, RAT p.305:5-20; pp.282:3-283:6.
[66] Lodgment 2, RAT pp.287:22-288:15.

Nissan[67] and the United Rentals truck[68] that also could have been used for the crimes.

While police lifted latent fingerprints off the doors of all the stolen trucks, none matched Defendants' fingerprints.[69] Police conducted fingerprint analyses of the items recovered from the trucks, but those prints did not match Defendants' prints.[70]

**Calhoun's Residence and Vehicles.**

Calhoun worked with a friend buying cars, fixing them up and selling them for a profit.[71] When police searched one of Calhoun's vehicles, they found a <u>Parts, Equipment and Heavy Truck Trader</u> primarily filled with listings of stake bed trucks.[72] When police searched his residence, they found a mallet that looked like it had been used often to beat something very hard,[73] seven pairs of old sneakers, several pairs of new sneakers,[74] and a Rolex watch.[75]

**Search of Hillard's Property.**

In a search of Hillard's home, police found, among other things: a sander/grinder with a well-worn grinding wheel that was probably used to cut metal;[76] a lock-picking kit with several different-tipped lock picks;[77] two pairs of new sneakers;[78] twenty pairs of new sneakers still in boxes;[79] a book

---

[67] Police found a crimper (Lodgment 2, RAT p.284:10-22); bolt cutters used to cut metal (p.285:12-18); a heavy, metal wedge used to pound and/or break things (p.285:19-26); battery jumper cables (p.286:7-13); a piece of plastic from a vehicle (p.286:15-21); light bulbs (p.287:1-5); a locked Master lock, crescent wrench, channel locks and another opened Master lock (p.188:16-24); a trailer hitch (p.289:2-6); several pry bars (p.289:20-24); a large rock typically used to smash windows and covered with red paint particulate debris (p.290:6-16, p.1114:10-24); a power cord and power cord strip with multiple outlets (p.290:22-26); bolt cutters (p.291:20-25); tire jacks (pp.292:26-293:3); pry tools (292:26-293:3); a piece of wood similar to a piece of wood found under an ATM safe stolen from the Hall of Champions (p.294:18-25); a blue rag with dust on it (p.295:1-7); black wristwatch (pp.296:27-297:2); discs for power tools used to cut metal (p.298:7-27); a blue chisel (p.301:9-12); yellow rope (p.302:8-11); a broken link of chain (p.302:18-27); a piece of rusty chain about 12 feet long with a hook at one end (p.306:10-20); a torn corner of an ATM deposit envelope with the letter "N" on it (p.960:4-20); and metal shavings similar to those found around the areas of stolen ATMs that were later recovered (pp.893:20-895:10).

[68] Police found a metal chain coiled in a bucket, a dolly, a mag-lite, a flat-bladed screwdriver typically used by car thieves to punch ignitions and start the car, a nylon rope and a crowbar. Lodgment 2, RAT pp.499:2-500:3, pp.501:2-503:2, p.530:11-28.

[69] Lodgment 2, RAT pp.524:27-525:8; pp.965:7-966-7.

[70] Lodgment 2, RAT pp.964:26-966:23; p.1114:2-9.

[71] Lodgment 2, RAT pp.1127:16-1128:19.

[72] Lodgment 2, RAT p.313:5-14.

[73] Lodgment 2, RAT p.312:12-23.

[74] Lodgment 2, RAT pp.310:18-311:13.

[75] Lodgment 2, RAT pp.896:18-897:17.

[76] Lodgment 2, RAT pp. 757:26-759:2.

[77] Lodgment 2, RAT pp.983:18-984:10.

[78] Lodgment 2, RAT p.392:23-28.

[79] Lodgment 2, RAT pp.1100:23-1101:10.

entitled <u>Police Call Frequency Guide</u>;[80] a police scanner tuned to the eastern division, which covered

Mira Mesa and where most of the crimes occurred;[81] and several books and videos for "how to" launder

money, break into cars, make drivers licenses, bypass alarms, wrap heavy chains around an ATM and

use a stake bed truck with a Tommy lift to pull it out, bypass locks, steal ATM codes, bypass ATM

combination locks, and drill through and crack safes.[82] Police also found a yellow notepad with a list of

ATM locations written on it, including the Union Bank ATM located at the Hall of Champions.[83]

Additionally, police found $4,800 cash in the cushions of Hillard's living room couch.[84]

Finally, police found receipts in Hillard's wallet showing that he: on June 3 and 11, 2003, paid a

$13,000 cash advance for one year of rent; purchased several money orders, including one for $999.75

on July 1, 2003; bought fine jewelry on July 24, 2003 for $915; paid $2,700 cash to apply toward a

Sears Mastercard on September 3, 2003; and on September 8, 2003 deposited $1036 cash to his bank

account that had a balance of $15,307.01.[85] Hillard also paid cash for a Honda purchased on June 19,

2003 for $7,200[86] and $10,000 cash toward a corvette purchased on June 29, 2003.[87]

Phone records showed that between October 2002 and October 2003–the time period covering

the charged crimes–Calhoun made over 150 phone calls to Hillard and Hillard called Calhoun

approximately 300 times.[88]

**Similar Crimes.**

After Defendants' arrests on October 9, 2003, and during which time they remained in custody,

---

[80] Lodgment 2, RAT p.994:10-11.
[81] Lodgment 2, RAT pp.989:13-991:23
[82] Lodgment 2, RAT p.993:6-18, p.407:16-23; p.409:2-6; p.406:2-6; p.408:8-17; p.409:20-25; pp.406:15-407:8.
[83] Lodgment 2, RAT pp.411:12-412:24.
[84] Lodgment 2, RAT pp.531:17-532:1. Other items police recovered in Hillard's home included "rugged exposure" high-powered binoculars (Lodgment 2, RAT pp.429:20-430:430:14); black gloves (pp.386:23-387:8); a flashlight (p.390:7-12); battery chargers; (pp.428:15-429:14); battery packs (pp.754:25-755:3); battery and plug-operated saws (pp.385:23-396:9; pp.389:24-390:4); a 24-inch pipe wrench (p.764:16-19); a double extra large plaid and black jacket (p.393:1-5); a double extra large black hooded sweatshirt (p.393:6-10); an acetylene torch kit (p.392:9-14); a portable welding kit (p.394:2-9); a steel plate with holes drilled in it (p.394:10-21); an electromagnetic drill press and case (p.432:7-20); portable battery-operated drills (pp.389:16-18; 391:1-8); a heavy plug-in drill (p.393:11-23); goggles (p.753:13-22); multi-sized steel-cutting drill bits that could cut through steel (p.391:4-8; pp.430:15-431:8); hole saws that could be used to enlarge holes drilled in the stolen ATMs (p.761:9-16; pp. 1111:2-1112:4); and a magnetic clamp capable of fusing a drill to a safe door during drilling along with a lubricant used to cool the metal during drilling (pp.871:14-875:23).
[85] Lodgment 2, RAT pp.985:4-987:6.
[86] Lodgment 2, RAT pp.731:6-732:1.
[87] Lodgment 2, RAT pp.728:5-729:6.
[88] Lodgment 2, RAT pp.456:6-457:8; p.935:12-21; pp.1016:2-1017:5.

more than twelve "crash and dash" ATM burglaries occurred in San Diego County.[89] A detective

described one series of burglaries as differing from the series Defendants were accused of because the

burglars were not methodical, used torching devices, usually had more than two people with them and

the group included a white man (Defendants are black).[90] A different series of ATM burglaries involved

multiple black males, old stolen vans and unsuccessful attempts.[91]

For approximately one year preceding Defendants' arrests, there were a series of nine uncharged

burglaries of businesses in North County.[92] These burglaries were perpetrated by two men who used

metal chains and stolen Ford F-250, F-350 and F-450 trucks with Tommy lifts to remove ATMs from

businesses. They then drilled through the ATM to reach the money.[93] One specific burglary conducted

on January 20, 2003 at the XiMed Medical Center was similar to the burglaries of the Hall of

Champions and the Chevron station, and netted the burglars $31,900.[94] This set of burglaries stopped

after police apprehended Defendants.[95]

**The Stipulation.**

In pretrial proceedings, the parties discussed convictions Defendants suffered in 1994 for the

joint commission of several burglary and theft offenses. Through the evidence presented at that trial,

Defendants learned about the methodology for obtaining shoe print evidence. The prosecutor filed a

pre-trial motion to admit evidence of those prior crimes, but after the defense objected, the prosecutor

withdrew the motion.[96] The prosecutor, however, advised the court and defense counsel that if

Defendants raised the lack of shoe print evidence as a defense in this case, he would rebut with evidence

showing that Defendants learned about shoe print matching techniques during the 1994 case and

developed strategies to avoid any matches during their current crimes.[97]

At trial, Petitioner's trial counsel cross-examined a detective regarding whether shoe prints taken

---

[89] Lodgment 2, RAT pp.921:4-922:5.
[90] Lodgment 2, RAT p.942:12-22; p.943:10-17.
[91] Lodgment 2, RAT pp.942:23-943:9.
[92] Lodgment 2, RAT pp.939:21-944:9.
[93] Lodgment 2, RAT pp.939:21-944:9.
[94] Lodgment 2, RAT pp.963:9-964:5.
[95] Lodgment 2, RAT pp.939:21-944:9.
[96] Lodgment 2, RAT pp.1:20-19:20.
[97] Lodgment 2, RAT pp.51:12-53:18.

07cv397 LAB (NLS)

1  at the crime scenes matched prints from Petitioner's sneakers.[98]  After defense counsel started this line of

2  questioning the court, in a sidebar, warned counsel that she was getting into an area that could open the

3  door to prior convictions.[99]  Counsel confirmed she was aware of that, and did not ask any more

4  questions.[100]

5       On rebuttal the prosecutor sought to introduce evidence from the 1994 trial.  He offered to do so

6  by way of a "sanitized stipulation" that excluded information on the 1994 charges and convictions, and

7  referred to the 1994 trial as only "legal proceedings involving Mr. Hillard and Calhoun."[101]  In deciding

8  to admit the stipulation, the trial court concluded that Petitioner opened the door to information about

9  the 1994 trial, and that the proposed stipulation did not contain evidence of "other crimes," but rather,

10  evidence of Defendants' knowledge of the shoe print analysis.[102]

11       The parties, therefore, stipulated that Defendants were involved in a 1994 legal proceeding

12  where there was detailed evidence explaining how law enforcement can use shoe print analysis to link

13  suspects to a crime by lifting latent shoe prints from a crime scene and comparing them to a suspect's

14  shoes.[103]

15                              **LEGAL STANDARD**

16  **AEDPA Governs this Petition.**

17       The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Petition.  *See*

18  *Lindh v. Murphy*, 521 U.S. 320, 336-337 (1997).  Under AEDPA, a federal court will not grant habeas

19  relief with respect to any claim adjudicated on the merits in state court unless the decision was (1)

20  contrary to or involved an unreasonable application of clearly established federal law;[104] or (2) based on

21  an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d);

22  *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

23  / / /

24

25       [98] Lodgment 2, RAT pp.553:16-554:6.
        [99] Lodgment 2, RAT pp.554:10-556:10.
26       [100] Lodgment 2, RAT pp.554:10-556:10.
        [101] Lodgment 2, RAT pp.660:2-662:13.
27       [102] Lodgment 2, RAT pp.656:19-657:4.
        [103] Lodgment 2, RAT p.1099:2-20.
28       [104]  "Clearly established federal law," for purposes of § 2254(d), means "the governing principle or principles set forth
    by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

**Decisions that Contradict or Unreasonably Apply Federal Law.**

A federal habeas court may grant relief where the state court (1) decides a case "contrary to" federal law by applying a rule different from the governing law set forth in Supreme Court cases; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may also grant habeas relief where a state court decision is an "unreasonable application" of federal law, such as where the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies those decisions to the facts at issue. *Id.*

The state court decision must be more than incorrect or erroneous; to warrant habeas relief the state court's application of "clearly established federal law" must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "Objectively unreasonable" differs from "clear error" in that a federal court cannot grant habeas relief only because it believes that the state court erroneously or incorrectly applied "clearly established federal law;" the application must be objectively unreasonable. *Id.* at 75-76 (internal citation omitted).

**Decisions Based on an Unreasonable Determination of the Facts.**

Section 2254(e)(1) provides: "[a] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id*.

**Review of the State Court Decision.**

If the State Supreme Court silently denies a Petitioner's appeal with a summary dismissal, the reviewing federal habeas court must look through to the last reasoned state court opinion in making a decision. *See Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). Here, the decision from the California Court of Appeal is the last-reasoned state court decision addressing Petitioner's claims.

**DISCUSSION OF PETITIONER'S CLAIMS**

**A.    Claim One: Conviction Based on Insufficient Evidence Violated Due Process.**

Petitioner claims his due process rights were violated because there was insufficient evidence to support his convictions for the crimes that occurred other than on the night of his October 9, 2003 arrest. These crimes included (1) four counts for unlawfully taking or driving a vehicle (counts 9, 10, 14, 17);

1 (2) two counts of grand theft (counts 12, 16); (3) one count of attempted grand theft (count 19); and (4)

2 four counts of burglary (counts 11, 13, 15, 18). Petitioner argues that the evidence supporting his

3 convictions for those thefts and burglaries is insufficient because other than on October 9, 2003, no

4 witness identified Petitioner as someone seen in any of the stolen trucks; no witness identified Petitioner

5 at any of the theft or burglary scenes; no witness saw any of the stolen trucks at Petitioner's residence;

6 and evidence connecting Petitioner to the stolen trucks arose long after they were stolen.[105]

7 "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a

8 reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re*

9 *Winship*, 397 U.S. 358, 364 (1970). When evaluating a sufficiency of evidence claim and whether due

10 process rights have been violated, the court must determine whether *any* rational trier of fact could have

11 found proof of guilt beyond a reasonable doubt. *Wright v. West*, 505 U.S. 277, 283-284 (1992) (internal

12 quotations omitted); *Mikes v. Borg*, 947 F.2d 353, 356 n.5 (9th Cir. 1991). In making this determination,

13 the court must view the evidence in the light most favorable to the prosecution, and must presume the

14 trier of fact resolved conflicting evidence in favor of the prosecution. *Id.*

15 Petitioner challenges his convictions for the thefts of trucks from ThyssenKrupp Elevators, ICI

16 Paints, Sherwin Williams and Davies Electric; grand theft for stealing ATMs from the Hall of

17 Champions and the Chevron station; attempted grand theft of the ATM from the Beacon gas station; and

18 burglaries of the Hall of Champions, Dominic's Deli, the Chevron station and the Beacon gas station.

19 Substantial circumstantial evidence tied Petitioner to these crimes. This evidence included items found

20 in the Nissan Frontier that Defendants drove on the night of their arrest, which contained license plates

21 registered to ICI Paints; ThyssenKrupp Elevators hard hats and a generator that were in the stolen

22 ThyssenKrupp truck; two pieces of padlocked chain that were stolen from the Davies' Electric yard at

23 the same time as the Davies Electric truck; metal shavings similar to shavings found near where the

24 stolen ATMs were recovered; tools that could be used to cut metal and windows; and several other items

25 that could have been used for the thefts and robberies. Police found the rack from the stolen

26 ThyssenKrupp truck outside the Hall of Champions after that burglary.

27 While no witness positively identified Petitioner at any of the theft scenes, witnesses to the

28

[105] Lodgment 3, pp.26-29.

1  Beacon gas station burglary saw two men similar to Defendants' build wearing ski masks, gloves and

2  dark clothes–similar to what Petitioner was wearing on the night of his arrest–trying to remove an ATM.

3  A surveillance video from the Chevron station burglary depicted a truck with the Sherwin Williams logo

4  on it and showed two persons similar to Defendants' size and shape.

5        The lack of any testimony identifying any of the stolen trucks at Petitioner's residence does not

6  illustrate Petitioner's lack of involvement for those crimes, but rather, simply shows that he did not park

7  the stolen trucks at his house.

8        Finally, during the time period of the thefts–from October 2002 to October 2003–Defendants

9  made several hundred phone calls to each other. These phone calls, along with Petitioner's

10 collaboration with Hillard on the night of the arrest, evidenced a professional, established relationship,

11 and reasonably could have tied Petitioner to the evidence found in Hillard's home. Evidence found in

12 Hillard's home included several tools used to commit the charged crimes, videos, booklets and notes

13 detailing how to commit the charged crimes, receipts for expensive cash transactions, cash, and several

14 new pairs of sneakers. Officers who searched Petitioner's home also found several new pairs of

15 sneakers. The sneakers found in both homes, along with Defendants' stipulation, could reasonably

16 show that Defendants bought several new pairs of sneakers so that they could discard each pair after

17 they used them in a crime.

18        This Court finds that the jury and the state appellate court could have relied on these facts to

19 support Petitioner's convictions. In relying on these and other circumstantial facts, the state court could

20 have found proof of guilt beyond a reasonable doubt for the charged crimes. Such reliance does not

21 appear to be "objectively unreasonable" or speculative because these facts, taken in the light most

22 favorable to the prosecution, support the convictions for the charged crimes. Therefore, the state court

23 decision did not contradict or unreasonably apply "clearly established federal law" as determined by the

24 United States Supreme Court and did not rely on an unreasonable determination of the facts. This Court

25 **RECOMMENDS** that Petitioner's claim for a due process violation based on insufficient evidence to

26 support his convictions be **DENIED**.

27 / / /

28 / / /

07cv397 LAB (NLS)

**B.** **Claim Two: Admission of Prior Crimes Evidence Violated Due Process and Right to a Fair Trial.**

Petitioner claims the trial court made two erroneous evidentiary rulings that deprived him of his rights to due process and a fair trial. He contests the admission of (1) a stipulation between Petitioner and the prosecutor that at a 1994 judicial proceeding involving and attended by the defendants, detectives explained how they linked suspects to crime scenes by comparing latent crime scene shoe print lifts to shoes recovered from suspects; and (2) evidence of a series of uncharged burglaries ending with Defendants' arrests.

The admission of prior bad acts violates due process if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van De Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). The challenged evidence must necessarily prevent a fair trial, in that it must "so infuse[ ] the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (holding that admission of evidence of prior uncharged crime did not violate federal due process); *see Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986) (finding that videotape of victim's autopsy, while unpleasant, was not inflammatory and thus did not violate right to fair trial).

### 1. The Stipulation.

The prosecutor warned defense counsel that if Petitioner raised a lack of shoe print evidence defense, the prosecutor would seek to admit evidence of Petitioner's 1994 convictions. Despite the prosecutor's warning, defense counsel raised the issue. After the trial court agreed that evidence of the 1994 proceedings was relevant to the prosecution's rebuttal to Petitioner's defense, the parties stipulated to admitting the following information: Calhoun and Hillard were involved in a legal proceeding in 1994 where there was detailed evidence explaining how law enforcement can use a shoe print analysis to link suspects to a crime. The evidence explained that officers can lift latent shoe prints from a crime scene and compare the prints to a suspect's shoes.

The trial judge admitted the stipulation because it went to Defendants' knowledge of how law enforcement analyzes shoe prints and could explain why Defendants had so many pairs of new sneakers. The trial judge specifically explained that this was not evidence of prior bad acts. Considering the prosecutor's warning, Petitioner's conscious decision to pursue the line of questioning and the trial

court's sanitation of Petitioner's 1994 charges, conviction and trial, admission of the stipulation did not "so infuse the trial with unfairness as to deny due process of law." Rather, the jury could draw permissible inferences from the stipulation that did not have to do with "other crimes."

### 2. The Uncharged Burglaries.

Despite having represented that he would not rely on a third-party culpability defense, Hillard cross-examined a detective about a series of "crash and dash" burglaries that continued after Defendants' arrests.[106] The style of these "crash and dash" burglaries differed from the charged burglaries.[107]

The prosecution rebutted with evidence of other uncharged burglaries of businesses in North County that were perpetrated by two men who used metal chains and stolen Ford F-250, F-350 and F-450 trucks with Tommy lifts to remove ATMs from businesses and drilled through the ATMs to reach the money. This set of burglaries stopped after police apprehended Defendants. The trial court admitted this evidence because it found Defendants had opened the door to evidence of similar burglaries and because the amount stolen from XiMed Medical Center, $31,900, was a relevant, circumstantial explanation for the cash money Hillard spent and possessed during the time of the charged burglaries.[108]

The prosecution's evidence of the similar burglaries rebutted evidence Petitioner submitted that the burglaries were ongoing after Defendants' arrests. This evidence could show the jury that many burglaries–rather than just a few–ceased after Defendants' arrests. Also, while evidence of the XiMed burglary and the amount of money stolen may not have been *directly* relevant to Petitioner's case, it explained some of the evidence found in his co-conspirator's home. Finally, even if the jury considered evidence of these uncharged acts as "other crimes" evidence, the jury already knew–through the number of charged offenses–that Defendants repeatedly engaged in ATM burglaries. While the uncharged acts evidence went to the number of crimes committed, it did not offer new evidence that went to the substance of Defendants' acts. Therefore, this Court finds the jury could have drawn permissible inferences from admission of the uncharged acts and finds no sign that admission of this evidence necessarily prevented Petitioner from enjoying his right to a fair trial.

[106] Lodgment 2, RAT pp.937:4-939:10; pp.921:2-922:5.
[107] Lodgment 2, RAT p.942:12-22; p.943:10-17.
[108] Lodgment 2, RAT pp.947:2-956:26.

1    This Court **RECOMMENDS** that Petitioner's claims for due process and fair trial violations

2    based on admission of the stipulation and uncharged crimes be **DENIED**.

3    **C.    Claim Three: Sentencing Petitioner to Consecutive Terms Violated the Sixth and
         Fourteenth Amendments.**

4

5         Petitioner claims the trial judge violated his right to a jury trial and his due process rights by

6    imposing consecutive terms for counts 1, 3, 5, 6, 9, 10, 11, 13, 14, 15, 17 and 18 based upon facts

7    neither admitted nor found by a jury to be beyond a reasonable doubt. The trial judge doubled

8    Petitioner's sentences for these counts because he had a prior conviction that constituted a strike under

9    the Three Strikes law.[109] The judge then explained why he chose to impose the sentences

10   consecutively:[110]

11              The counts are largely independent of each other, largely happened at
                different times, different locations, different objectives. So for that reason
12              and because of the - - the length and breadth of Mr. Calhoun's record
                exclusive of his strikes, exclusive of the three prison priors - - in other
13              words, based on just the record that isn't represented by those current
                enhancements - - I think the consecutive sentencing scheme is appropriate
14              here and I intend to impose consecutive sentences . . .[111]

15        Petitioner challenges the consecutive sentencing under *Blakely v. Washington*, 542 U.S. 296

16   (2004), arguing that the trial court could not impose consecutive sentences without jury findings of the

17   facts supporting consecutive sentences. In April 2006 the state appellate court rejected this argument

18   based on the California Supreme Court's holding in *People v. Black*, 35 Cal. 4th 1238 (2005) *vacated by*

19   *Black v. California*, 127 S.Ct. 1210 (2007). The California Supreme Court also denied Petitioner's

20   challenge, but denied it without prejudice to any relief he might receive after the United States Supreme

21   Court decided *Cunningham v. California*, 549 U.S. __, 127 S.Ct. 856 (2007) and its effect on *Blakely*

22   and *United States v. Booker*, 543 U.S. 220 (2005).[112]

23   _____

24              [109] Lodgment 2, RAT pp.1453:14-1454:3-6; Lodgment 6, p.29.
              [110] A trial court sentencing a defendant under the Three Strikes law must impose consecutive sentences if the acts leading
25   to the defendant's multiple felony convictions in the current proceedings were "not committed on the same occasion" and did not
     "aris[e] from the same set of operative facts." Cal. Penal Code § 667(c)(6). Only where the defendant committed acts on the
26   same occasion, or committed them on separate occasions but they arose from the same set of operative facts, does a trial court
     have the discretion to impose concurrent sentences. *People v. Lawrence*, 24 Cal. 4th 219, 229-230, 233 (2000). Acts occurring
27   on the same occasion are defined as those occurring in "close temporal and spatial proximity," and acts arising from the same set
     of operative facts share "common acts or criminal conduct that serve[ ] to establish the elements" of the offenses. *Id.* at 233.
28              [111] Lodgment 2, RAT p.1454:3-15.
              [112] Lodgment 8.

                                              16                                    07cv397 LAB (NLS)

1    The *Blakely* decision followed the high court's decision in *Apprendi v. New Jersey*, 530 U.S. 466

2    (2000).  In *Apprendi*, the Court held that the fourteenth amendment right to due process and the sixth

3    amendment right to a jury trial requires that "[o]ther than the fact of a prior conviction, any fact that

4    increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

5    and proved beyond a reasonable doubt."  530 U.S. at 476-477, 490.  The Ninth Circuit has determined

6    that *Apprendi* is not implicated by the decision to run sentences consecutively in the context of the

7    federal guidelines when the sentences do not violate *Apprendi* in their own right.  *United States v.*

8    *Buckland*, 289 F.3d 558, 570-72 (9th Cir. 2002).

9        In *Blakely*, the Court defined the term "statutory maximum" as used in *Apprendi* to mean "the

10   maximum sentence a judge may impose on the basis of the facts reflected in the jury verdict or admitted

11   by the defendant."  542 U.S. at 303.  Then, in *Booker*, the Supreme Court found that there "is no

12   relevant distinction between the sentence imposed pursuant to the [state] statutes in *Blakely* and the

13   sentences imposed pursuant to the Federal Sentencing Guidelines" in that case.  543 U.S. at 235.

14       Even assuming *Apprendi* or *Blakely* could be read to apply sixth amendment protection to the

15   decision to run sentences consecutively under state law, the *Cunningham* Court did not address

16   consecutive sentencing under California law.  In *Cunningham*, the Court found that other than for the

17   fact of a prior conviction, California's determinate sentencing law was unconstitutional to the extent it

18   permitted imposition of upper term sentences based on findings made by a judge under a preponderance

19   of the evidence standard rather than by a jury beyond a reasonable doubt.  549 U.S. __, 127 S.Ct. 856.

20   In any case, unlike the defendant in *Cunningham*, who had a right under California law to the imposition

21   of a middle-term sentence absent findings of aggravating factors, Petitioner here has not shown a

22   corresponding right to concurrent sentencing under California law similar to his right to a middle term

23   sentence.  *See Blakely*, 542 U.S. at 309 (recognizing that the legal right to a lesser sentence is the main

24   concern in providing sixth amendment protection to sentencing decisions).

25       After Respondents submitted their brief for this case, the California Supreme Court issued its

26   post-remand opinion in *People v. Black*, 41 Cal.4th 799 (2007) in light of the *Cunningham* decision.

27   The California Supreme Court held that the imposition of consecutive sentences does not implicate a

28   defendant's sixth amendment rights.  *See Black*, 41 Cal. 4th at 821-23 ("The high court's decision in

17                                                                              07cv397 LAB (NLS)

*Cunningham* does not call into question the conclusion we previously reached regarding consecutive sentences.").

Accordingly, this Court **RECOMMENDS** that Petitioner's claim that the imposition of consecutive terms violated his rights to due process and a fair trial be **DENIED**.

### D. Joinder of Co-Defendant Hillard.

Petitioner says he joins co-defendant Hillard in all his habeas claims. But Hillard cannot join Petitioner's claims. According to Rule 2 of Rules Governing § 2254 Cases, Hillard must file his own verified federal habeas petition to seek such relief in this Court. This Court **RECOMMENDS** that Petitioner's request to join Hillard in his habeas claims be **DENIED**.

### CONCLUSION

Petitioner has failed to show that the state court's determinations were contrary to or an unreasonable application of clearly established federal law, or that they were based on an unreasonable determination of the facts. Therefore this Court **RECOMMENDS** that the Petition be **DENIED** in its entirety. The undersigned submits this report and recommendation to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than *__January 2, 2008__*, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than *__January 11, 2008__*. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED: December 7, 2007

Hon. Nita L. Stormes
U.S. Magistrate Judge

07cv397 LAB (NLS)